## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**UNITED STATES,**

    Plaintiff,

v.

**LARON TAYLOR,**

    Defendant.

CASE NO. 3:23 CR 38

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Defendant Laron Taylor moves to suppress all evidence obtained as the result of the searches of four parcels as well as all evidence obtained as the result of a residential search. (Docs. 25, 34). The Government opposes (Docs. 28, 35), Taylor replies (Docs. 31, 34), and the Government responded to Taylor's supplemental arguments (Doc. 35). For the reasons discussed below, the Court denies Taylor's motions.

### BACKGROUND

Taylor is charged in a three-count indictment with (1) felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); (2) possession with intent to distribute a controlled substance (a substance containing fentanyl), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(1). (Doc. 11).

The following facts are taken from the search warrant affidavit submitted by Detective Randall Mull of the Sylvania Township Police Department in support of an anticipatory residential

search warrant executed on December 30, 2022 at an address on Mansfield Road in Toledo, Ohio. (Doc. 25-1).

In December 2019, Postal Inspector Brandon Holestine identified a package as a suspected drug parcel. (Doc. 25-1, at ¶ 3). The parcel was addressed to Brenda Shortz at an address on Mansfield Road[1] and had a return address of Music by Mail in Los Angeles, CA. *Id.* Narcotics canine Rico (handler: Perrysburg Township Officer Nick Owens) gave a positive alert on the package. *Id.* at ¶¶ 5-6. The search warrant affidavit attests to Rico's reliability based on June 2019 certification with Owens by the Ohio Peace Officers Training Academy. *Id.* at ¶ 7. Officers obtained a search warrant for this parcel and found methamphetamine. *Id.* at ¶ 8. DEA testing confirmed the package contained tablets containing methamphetamine and caffeine. *Id.*

Postal Inspectors reviewed internet tracking activity for the package and tied it to Taylor's IP address. *Id.* at ¶ 9. They also reviewed USPS records related to previous shipments and found similar parcels that were delivered in January 2020. *Id.* at ¶ 11. After January 2020, Postal Inspectors and DEA Task Force Officers conducted surveillance at the address to which the packages were delivered and saw Taylor enter and exit. *Id.* at ¶ 12. In May 2020, officers observed delivery of a similar package to the first, and watched Taylor take it inside. *Id.* at ¶ 13.

In September 2020, officers identified and interdicted another suspicious package. *Id.* at ¶ 14-15. This one was addressed to Alex Henry at Taylor's address and had a return address of Westly A in Palmdale, CA. *Id.* Rico (with handler Officer Owens) again gave a positive alert. *Id.*

---

1. Taylor asserts that all four packages were addressed to his residence (the address at which the search warrant was executed). As the Government points out, the affidavit lists this first package as addressed to an address on Mansfield Road that differs by one digit from the address at which the residential search warrant was executed. *See* Doc. 29, at ¶ 3. It seems likely that this was a typographical error. However, because below the Court finds that even if the package were sent to Taylor's address, he lacks standing to challenge the search thereof, it is unnecessary to resolve this factual issue.

at ¶¶ 17-18. Inspector Holestine again obtained a search warrant; the package field-tested positive for cocaine and was sent to the US Postal Inspection Lab for analysis. *Id.* at ¶ 19.

In July 2021, UPS employees in Maumee identified a suspicious package and contacted the Toledo Police Department ("TPD"). *Id.* at ¶ 20. Narcotics canine Drex (handler TPD Detective Brian Gaylord) gave a positive alert on the package. *Id.* at ¶ 20. The package contained a substance which tested presumptively positive for methamphetamine; they were similar in look, size, and texture to those from the original December 2019 package. The search warrant affidavit asserts Gaylord and Drex were certified in March 2020 by the Ohio Peace Officers Training Academy and Drex is reliable. *Id.* at ¶ 21. No warrant appears to have been obtained for this package. The search warrant affidavit does not identify an address on the package, but the TPD field report identifies this package as addressed to Terrence Hubbard at Taylor's address from Los Angeles, CA. (Doc. 29-5, at 1-2).

On December 28, 2022, an informant contacted the DEA regarding a pending UPS shipment. (Doc. 29-1, at ¶ 23). A DEA task force officer along with Detective Gaylord and Drex responded; Drex gave a positive alert on the package. *Id.* at ¶ 24. Officers obtained a warrant; the package contained suspected fentanyl, though the pills were marked as Oxycodone Hydrocholoride. *Id.* at ¶ 26-28 ("Based on the Affiant[']s years of experience and training, as well as the training and experience of other investigators, he recognized the pills as containing fentanyl . . . based on numerous prior seizures of pills that are identical in appearance it is believed that these pills actually contain fentanyl."). This package was addressed to Terrance Hubbard at Taylor's address, with a return address of Michael Porter in Los Angeles, CA. (Doc. 29-3).

Based on all of the above, Detective Mull sought an anticipatory search warrant for the Mansfield Road address, to be based on a controlled delivery of sham narcotics in the fourth

package. Judge Ian English of the Lucas County Court of Common Pleas issued the warrant. (Doc. 25-1). This warrant was issued 31 minutes after the warrant to search the fourth package.

In support of his Motion, Taylor submits the expert report of Jerry T. Potter. (Doc. 31-1). Potter's curriculum vitae indicates experience training canines in the military. *See* Doc. 25-5. Potter reviewed the search warrant affidavits, as well as the training records for Drex and Rico. *See* Doc. 31-1. He further reviewed the TPD Canine Unit manual, which has certain training requirements. *Id.* He further reviewed the Perrysburg Township Manual, which refers to canines, but does not identify a specific written policy as to training. *Id.* He opines both dogs were undertrained, and, in his professional opinion, "both Drex and Rico should not be considered properly trained, and therefore cannot be used to establish probable cause until these deficiencies are addressed and adequately remedied by their respective departments." *Id.* at 4.

## DISCUSSION

In his motion, and expanded supplemental motion, Taylor seeks to suppress all evidence obtained in the search of the four parcels and in the search of the residence. He further seeks an evidentiary hearing. The Government responds that Taylor lacks standing to challenge the search of the four parcels, there was sufficient probable cause to issue an anticipatory search warrant for the residence, and that officers relied on the warrant in good faith. For the reasons discussed below, the Court denies Taylor's motions.

Standing

The Government first challenges Taylor's standing to contest the opening and search of the four parcels because he was not the sender, nor the addressed recipient of any; it relies on *United States v. Ligon*, 861 F. App'x 612, 619-20 (6th Cir. 2021). Taylor responds that he has standing because the packages were both mailed to his address ("Specifically, the parcels were addressed

4

to Mr. Taylor's residence and law enforcement connected Mr. Taylor to the residence"); he distinguishes *Ligon* as involving packages sent to two separate addresses (even though one was sent to Ligon's employer) and relies on dicta from other cases finding no standing where defendant was not the addresser, addressee, or at the address to which the package was mailed. *See* Doc. 34, at 2. As set forth below, the Court finds Taylor lacks standing to challenge the package searches.

To establish standing, a defendant must show that: (1) "he manifested a subjective expectation of privacy in the object of the challenged search;" and (2) "society is prepared to recognize that expectation as legitimate." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).

In *Ligon*, postal inspectors intercepted two suspicious packages addressed to two different addresses in Cleveland. 861 F. App'x at 615. The defendant was not the listed sender or recipient of either package. Officers performed a controlled delivery of the second package; 30 minutes after delivery, the defendant arrived at the address, went inside, and left with the package. *Id.* Defendant moved to suppress and the district court denied. On appeal, the Sixth Circuit found, "Ligon could not have had any subjective expectation of privacy in the packages because he did not send them and they were not addressed to him personally." *Id.* at 620 (citing *United States v. Elgin*, 57 F. App'x 659, 661 (6th Cir. 2003)). In a footnote, the court elaborated on defendant's argument: "Ligon argues that he had an expectation of privacy in the first parcel because it was addressed to his employer. That argument is unavailing because in addition to the fact that it is debatable whether Ligon was still employed by Delano when the first package was seized, he could not have had a subjective expectation of privacy in a package that he did not send and was sent to his employer—and not to him specifically." *Id.* at 620 n.10. Taylor seeks to distinguish *Ligon* on this basis – where the packages were sent. He contends that "here, all of the parcels were sent to

5

the same address – Mr. Taylor's address – which law enforcement connected to him." (Doc. 34, at 2). Additionally, in another (unpublished) Sixth Circuit case, the court found that an address alone was insufficient to establish a privacy interest. *United States v. James*, 2020 WL 13598804 (6th Cir.). In *James*, a package was mailed to "J. Fevers" at a Lansing, Michigan address associated with the defendant. *Id.* at *3. The court found the address alone was insufficient to establish a reasonable expectation of privacy in the package addressed to someone else:

> James argued that this change of address, along with the fact that his Michigan driver's license showed an address of 6400 Rosedale, established that his address and the address on the package are the same and that he therefore had a reasonable expectation of privacy with respect to the contents of the package.
>
> Other courts have held that an individual does not have a legitimate expectation of privacy in a package not addressed to him. *See United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994); *United States v. Daniel*, 982 F.2d 146, 149 (5th Cir. 1993) (per curiam); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988); *United States v. Givens*, 733 F.2d 339, 342 (4th Cir. 1984) (per curiam). We have not addressed this issue in a published opinion but have noted that some courts have "question[ed] the extent to which a defendant can claim a reasonable expectation of privacy in a package addressed to a fictitious name." *United States v. Robinson*, 390 F.3d 853, 869 n.24 (6th Cir. 2004).
>
> James asserted that 6400 Rosedale was his address. This, however, is far from clear. But even if it were a legitimate address for James, it would not, without more, establish that he had a legitimate expectation of privacy to the contents of a package delivered to that address but addressed to another individual. *See United States v. Stokes*, 829 F.3d 47, 53 (1st Cir. 2016) (rejecting defendant's "contention that an address alone can create a reasonable expectation of privacy in a parcel"). In his motion, James cited a number of cases for the proposition that "individuals have a reasonable expectation of privacy in packages addressed to them under fictitious names even when the false names are used to distance the sender or recipient from the criminal nature of the contents of the package," and he continues to rely on this in his pro se brief. But notably, James never asserted that "J. Fevers" was an alias that he had ever used nor offered any evidence to support such an assertion.
>
> There is nothing in this record that could lead to a conclusion that James had "an actual, subjective expectation of privacy" in the package addressed to J. Fevers that "was a legitimate, objectively reasonable expectation." *Smith*, 263 F.3d at 582; *see also United States v. Elgin*, 57 F. App'x 659, 661 (6th Cir. 2003). There is therefore no arguable basis for an appeal of the district court's denial of James's initial motion to suppress.

6

*Id.* at *3-4.

First, as to the argument that Taylor had a Fourth Amendment right to privacy in the packages because they were sent to an address which law enforcement connected him to, the Court agrees with the Government that being the target of an investigation does not establish a Fourth Amendment right. *See Rakas v. Illinois*, 439 U.S. 128, 129 (1978).

Second, the Court finds Taylor lacks standing to challenge the search of the parcels. As noted above, although all four packages were sent to Taylor's address[2], the addressees and return addresses for the four parcels were:

- To: Brenda Shortz; From: Music by Mail, Los Angeles, CA (December 2019)
- To: Alex Henry; From: Westly A, Palmdale, CA (September 2020)
- To: Terrence Hubbard; From: Los Angeles, CA (July 2021)
- To: Terrance Hubbard; From Michael Porter, Los Angeles, CA (December 2022).

In addition to *Ligon*, other circuit courts have found that one who is neither the sender nor addressed recipient does not have standing to challenge the search of a package. *See United States v. Campbell*, 434 F. App'x 805, 809 (11th Cir. 2011) ("[W]hile Alex [Campbell]'s name was on the lease [at the address to which the package was delivered], the Campbells were not the sender or named addressee on the package, nor did they establish a connection to the named addressee or show that they used the name on the package as an alias."); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988) (finding individual who was "neither the sender nor the addressee of the

---

2. Again, the Court notes the slight difference in the address listed on the first parcel. *See* Doc. 29, at ¶ 3. To the extent this address is correct, Taylor has not asserted any connection to this address and therefore separately lacks standing to challenge the search of the first parcel. To the extent this is a typographical error and the package was sent to Taylor's address, he lacks standing for the reasons discussed below.

7

package" had no privacy right); *United States v. Givens*, 733 F.2d 339, 341-43 (4th Cir. 1984) ("[D]efendants cite no direct authority for the proposition that when A sends a package to B, the contents of which are ultimately intended for C, that C is entitled to claim a privacy interest in the contents of the package. Nor do we think this argument is tenable on its merits."); *United States v. Pitts*, 322 F.3d 449, 456-57 (7th Cir. 2003) (defendant who mailed a package with a false return address had no legitimate expectation of privacy in the package because he had abandoned it (by using a fake name and return address and then putting it in the mail and disavowing it): "He launched the package into the stream of mail without any legitimate way of retrieving it").

And the Fourth Circuit has explained that an individual lacks a reasonable expectation of privacy in a package addressed to another "because, at the time of the searches, there were no objective indicia that [the individual] owned, possessed, or exercised control over the packages." *United States v.* Rose, 3 F.4th 722, 729 (4th Cir. 2021). The court elaborated: "

> Rose did not have possession of the packages at the time of the searches, and nothing in the record demonstrates that he would have been able to gain possession of the packages at the FedEx facility. . . Because the two packages bore another person's name and lacked objective indicia connecting Rose to the packages as the intended recipient, he would not have been able to exercise at the FedEx facility any ownership rights or control over the packages.

3 F.4th at 729 (footnote omitted). This analysis – that something more, some "objective indicia" is required – aligns with the Sixth Circuit's statement in *James* that an address "would not, ***without more***, establish that he had a legitimate expectation of privacy to the contents of a package delivered to that address but addressed to another individual." 2020 WL 13598804, at *3 (emphasis added). Although *Rose* differs in that the package was not sent to the defendant's address, just as in *Rose*, here Taylor did not have possession of the packages at the time of the searches and nothing demonstrates he would have been able to gain possession of them when they were in USPS or UPS custody, given that he was neither the addressed sender or recipient. He has not established a

subjective expectation of privacy that society is prepared to recognize as legitimate in packages neither addressed to, nor mailed by, him. *See Ligon*, 861 F. App'x at 620; *James*, 2020 WL 13598804, at *3; *Campbell*, 434 F. App'x at 809; *Givens*, 733 F.2d at 341-43; *Pitts*, 322 F.3d at 446-57.

In sum, the Court holds Taylor lacks standing to challenge the search of any of the four parcels.

Probable Cause

Having determined Taylor lacks standing to challenge the search of the parcels, the Court turns to his underlying argument regarding the anticipatory search warrant for the residence. Taylor argues the warrant lacked probable cause because (1) it was based on stale evidence; (2) it relied on unreliable canine sniffs; and (3) the non-stale evidence was speculative and insufficient to establish probable cause. In his supplement, he contends he is entitled to a hearing to challenge the reliability of the dogs. The Government responds that Taylor has not raised sufficient evidence to challenge the dogs' reliability at a hearing, the warrant was supported by sufficient probable cause, and alternatively, the officers relied in good faith on the warrant in executing the search.

Federal constitutional law applies to state warrants challenged in federal court. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To establish probable cause, officers must establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Put another way, there must be a "nexus" between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir.

2021). Whether the affidavit gives rise to this fair probability "depends on the totality of the circumstances." *Frazier*, 423 F.3d at 531 (citing *Gates*, 462 U.S. at 230). "The probable cause standard is a 'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" *Id.* (quoting *Gates*, 462 U.S. at 231). "Anticipatory search warrants, like all search warrants, require probable cause. The triggering event provides that cause." *United States v. Perkins*, 887 F.3d 272, 274 (6th Cir. 2018) (internal citations omitted).

In assessing the sufficiency of an affidavit supporting a warrant, the Court looks only to the four corners of the affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). To encourage use of the warrant procedure, a magistrate judge's probable-cause determination is afforded "great deference" and should be reversed only if the issuing judge arbitrarily exercised his discretion. *Gates*, 462 U.S. at 236 (quotation omitted); *see also United States v. Baker*, 976 F.3d 636, 646 (6th Cir. 2020) (recognizing courts' obligations to give issuing judges the benefit of the doubt in "doubtful or marginal cases"); *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) ("[W]e may only reverse a magistrate's decision to grant a search warrant if the magistrate arbitrarily exercised his or her authority."); *United States v. Lapsins*, 570 F.3d 758, 763 (6th Cir. 2009) ("[S]o long as the magistrate had a substantial basis for . . . concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.").

**Staleness**

Taylor first argues the large gaps in time between packages demonstrate staleness and detract from a finding of probable cause. *See* Doc. 25, at 5 ("There is nothing in the affidavit that indicates criminal activity remained ongoing, particularly in the approximately eighteen-month gap preceding the search of the final seized parcel. As such, this Court should determine that all

10

the evidence preceding the seizure of the parcel in December 2022 is stale and thus cannot provide probable cause for a search warrant.").

"[S]tale information cannot be used in a probable cause determination." *United States v. Perry*, 864 F.3d 412, 414 (6th Cir. 2017) (quoting *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009)); *see also United States v. Harris*, 255 F.3d 288, 299 (6th Cir. 2001) ("Because probable cause to search is concerned with facts relating to a presently existing condition, . . . there arises the unique problem of whether the probable cause which once existed has grown stale." (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). Whether evidence is stale is a flexible inquiry that does not "create an arbitrary time limitation within which discovered facts must be presented to a magistrate." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) (quoting *Spikes*, 158 F.3d at 923). "A key but by no means controlling issue is the length of time between the events listed in the affidavit and the application for the warrant." *United States v. Leaster*, 35 F. App'x 402, 406 (6th Cir. 2002). Courts should consider several factors, including:

> [1] [t]he character of the crime (chance encounter in the night or regenerating conspiracy?), [2] the criminal (nomadic or entrenched?), [3] the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [4] the place to be searched (mere criminal forum of convenience or secure operational base?).

*Greene*, 250 F.3d at 480–81 (quoting *Spikes*, 158 F.3d at 923).

The Court finds the totality of the circumstances and weighing of these factors demonstrates the information was not stale. As to the first factor, the evidence shows investigation into an allegedly ongoing drug operation. To be sure, there are gaps in between each package, but the method of delivery (packages shipped from California, under fake names, to fake names, etc.) is the same each time. Further, even if the information regarding the earlier packages was stale on its own, combining that with the more recent information (an informant's specific tip about a recent package), makes it not stale. *See United States v. Penney*, 576 F.3d 297, 312 (6th Cir. 2009) ("[A]n

11

issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking. While past drug-trafficking activity alone does not make such an inference reasonable, with *continuing* criminal operations, any issue of staleness [of information regarding past criminal activity], or the lack of a direct known link between the criminal activity and residence, becomes minimal.") (internal quotations and citations omitted). Alternatively, even if the information regarding the first three packages was stale and should be removed, the Court finds the facts that remain are sufficient to establish probable cause. As to the second factor, there does not appear to be any dispute that Taylor resided at this location throughout the time period the packages arrived; thus he was "entrenched," not "nomadic". As to the third factor, the things to be seized included evidence of drug trafficking, not just the drugs themselves. And, officers witnessed the controlled delivery, so they at least knew the package previously containing drugs was in the house. These are not perishable items. Fourth and finally, like the second factor, Taylor had been at the house since 2019 (making it more like an operational base than a criminal forum of convenience). As such, the Court rejects Taylor's argument that the search warrant was based on stale information or lacking in probable cause as a result..

**Reliability of Dogs**

Next, Taylor contends the dogs are undertrained and unreliable. The Government responds that the dog sniffs "added little to the finding of probable cause, but were nonetheless reliable." (Doc. 28, at 15). It further asserts that, because Taylor lacks standing to challenge the package searches themselves, "even if you remove the K9 alerts, there is still more than enough evidence for this court to find Judge English had a substantial basis to find probable cause." *Id.* at 16. The search warrant affidavit contained information that the December 2019 package sent to Taylor's address contained a substance that field and laboratory tested positive for methamphetamine;

Taylor's IP address was tracking that package; Taylor was observed at the address to which the packages were sent; the packages were sent using postage purchased with cash; the September 2020 package contained a substance that field tested positive for cocaine; the July 2021 package contained pills that field tested positive for methamphetamine and were similar in look, size, and texture to those in the December 2019 package (which lab-tested positive); an informant said the December 2022 package contained drugs, and the package contained pills that task force officers, based on their training and experience, believed contained fentanyl. *See* Doc. 25-1.

Thus, the Court agrees with the Government that even absent the dogs' alerts on the packages, the affidavit provided probable cause for the anticipatory residential search warrant. The Court addresses the argument regarding the dogs' reliability in the context of Taylor's request for a hearing below.

**Entitlement to Hearing**

Taylor argues he is entitled to a hearing under two theories: one – the traditional *Franks* hearing / materially false statement theory, and two – the standard set forth in *Florida v. Harris* regarding drug sniffing dogs.[3] The Court addresses Taylor's contentions in reverse order.

Relying on *Florida v. Harris*, 568 U.S. 237 (2013), Taylor argues he is entitled to a hearing to challenge the dogs' reliability. In *Harris*, the Supreme Court held that a court may presume that a dog's alert establishes probable cause to justify a search if the dog has been certified by a "bona fide organization . . . after testing his reliability in a controlled setting". *Id.* at 246-47; *see also id.*

---

3. In his initial motion, Taylor argued he was entitled to a *Franks* hearing based on two false assertions made by Detective Mull in the search warrant affidavit. The purportedly false assertions were related to the dogs' certifications, which he argued did not exist because he had not received them in response to a discovery request. *See* Doc. 25, at 7. The Government in opposition asserted it had provided them and they did, in fact, exist. Although it is unclear whether both certifications had been provided previously, Taylor now concedes both have. (Doc. 31, at 1). Thus, Taylor's original argument for a *Franks* hearing– a false statement regarding certifications – is moot.

at 246 n.2 ("a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found."). *Harris* also held, however, that one "must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.* at 247. *Harris* involved whether a dog sniff establishes probable cause for a search in the first instance. *See id.* at 240 ("In this case, we consider how a court should determine if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle.").

But the facts presented here are a step removed from those in *Harris*. As noted above, Taylor lacks standing to challenge the use of the dog sniffs to provide probable cause to search the packages. That is, in the present case, the Court is not evaluating whether the dog sniffs themselves provided probable cause to search the packages, but instead whether the totality of the information in the search warrant affidavit supported probable cause for a search of the residence. Because such a review is limited to the four corners of the affidavit, Taylor is not entitled to a hearing solely based on *Florida v. Harris*. Rather, he must satisfy the *Franks* hearing requirements. *See United States v. Robinson*, 2020 WL 3962130, at *2 (N.D. Ohio) ("*Harris*, however, did not create an exception to the ordinary procedure leading up to a *Franks* hearing.").

Affidavits supporting search warrants carry a presumption of validity. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In order to obtain a *Franks* hearing, Taylor must (1) "make a substantial showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit"; and (2) "prove that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). If he satisfies both requirements, then the falsity or omission is set aside for the court to reevaluate whether the remaining content in the

14

affidavit is "sufficient . . . to support a finding of probable cause." *Franks*, 438 U.S. at 171–72. If it is not, then the defendant is entitled to a *Franks* hearing under the Fourth Amendment. *Id.* at 172.

Taylor argues, based on defense expert Potter's report, that neither Rico nor Drex "received training that meets either their agency or the nationwide training standards" (Doc. 25, at 6) and that their reliability was therefore misrepresented to the judges issuing the warrants:

> In each of the warrants at issue, the requesting officer swore to the reliability of the narcotics canines. . . While the issue of the officers' and canines' certifications has been resolved, it remains that the canines were not continuously trained according to industry and/or department standards. As such, their reliability was mispresented to the judges issuing the warrants when the affiant stated that, simply based on the word of the handling officer, the canines were reliable.

(Doc. 34, at 3).

The statements regarding the dogs in the warrant affidavit stated:

> 7. Officer Nick Owens has been State Certified as a Narcotics Canine handler and he and narcotics canine Rico have worked together since June 2019. Officer Nick Owens and canine Rico were both certified in June 2019 by the Ohio Peace Officers Training Academy (OPOTA). Officer Nick Owens and canine Rico have both completed 80 hours of a state-certified training program. During this time, Rico was trained and certified to alert to the presence of the odors from marijuana, cocaine, heroin, MDEA (methlyenedioxyethlaphamine), methamphetamine ("crystal meth"), and/or their derivatives. Officer Nick Owens has been trained how to handle a detector K 9 and read it's [sic] alerts. According to Officer Nick Owens, Rico is a reliable K-9 assist unit.

(Doc. 25-1, at ¶¶ 7, 18).

> Detective Brian Gaylord has been State Certified as a Narcotics Canine handler and he and narcotics canine Drex have worked together since March 2020. Detective Brian Gaylor and canine Drex were both certified in March 2020 by the Ohio Peace Officers Training Academy (OPOTA). Detective Brian Gaylord and canine Drex have both completed a two-week state-certified training program. During this time, Drex was trained and certified to alert to the presence of the odors from cocaine, heroin, methamphetamine, and/or their derivatives. Detective Brian Gaylord has been trained how to handle a detector K-9 and read it's [sic] alerts. According to Detective Brian Gaylord, Drex is a reliable K-9 assist unit.

15

*Id.* at ¶¶ 21, 25.

Potter's opinion does not satisfy the first *Franks* requirement: "a substantial showing that the affiant [Detective Mull, as to the December 2022 residential search warrant] knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit". That is, having now confirmed that the certification statements are accurate, the only other statement as to the dogs is "According to [the handling officer], [the dog] is reliable K-9 assist unit." First, Potter's opinion does not contradict the statement that the handling officer's opinion is that the dog is reliable. And second, Potter's opinion does not speak to whether Detective Mull, the affiant, knowingly or recklessly included a false statement or material omission. At best, Potter's opinion suggests a disagreement with the amount of training the dogs received. Moreover, as noted above, since Taylor lacks standing to challenge the search of the packages themselves, and the affidavit provides probable cause even absent the dog sniffs, he has also not satisfied the second requirement for a *Franks* hearing – that "the false statement or material omission is necessary to the probable cause finding in the affidavit." *Bateman*, 945 F.3d at 1008.

As such, the Court denies Taylor's request for an evidentiary hearing.

### Conclusion

For the foregoing reasons, good cause appearing, it is

ORDERED that Taylor's Motion to Suppress (Doc. 25) and Supplemental Motion to Suppress (Doc. 34) be, and the same hereby are, DENIED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE
